# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OUTBOX SYSTEMS, INC. d/b/a SIMPLUS, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| v. | ) ) ) | C.A. No. N21C-11-123 PRW CCLD |
| TRIMBLE, INC., | ) ) ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

Submitted: February 5, 2024
Decided: April 30, 2024

## DECISION AFTER TRIAL

Patricia L. Enerio, Esquire, Jamie Brown, Esquire, and Brendan Patrick McDonnell, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware, Gerry Silver, Esquire, SULLIVAN & WORCESTER LLP, New York, New York. *Attorneys for Plaintiff/Counterclaim Defendant Outbox Systems, Inc. d/b/a Simplus*.

Steven T. Margolin, Esquire, and Samuel L. Moultrie, Esquire, GREENBERG TRAURIG, LLP, Wilmington, Delaware, Daniel P. Elms, GREENBERG TRAURIG, LLP, Dallas, Texas. *Attorneys for Defendant/Counterclaim Plaintiff Trimble, Inc.*

**WALLACE, J.**

# I. INTRODUCTION

Whether building a skyscraper, a software program, or a legal case, always the devil is in the details. This litigation pits client against contractor after their joint undertaking to build the client's new digital sales platform short-circuited. The contractor, Outbox Systems, Inc. d/b/a Simplus, filed suit to collect about $2 million in invoices that went unpaid after the client, Trimble, Inc., fired it. Trimble counterclaimed, demanding that Simplus either refund Trimble for about $3.5 million in what it labeled overpayments or reimburse Trimble for the $4 million spent to complete the project without Simplus.

By Trimble's telling, Simplus promised to do top quality work on this sophisticated tech project but ended up making sophomoric mistakes that put the project behind schedule and over budget. So, Trimble says it doesn't owe Simplus any more money and, instead, deserves a refund. Simplus tells a different story. Simplus insists that its performance was adequate—if imperfect—and that Trimble kept Simplus working despite knowing about the setbacks. In Simplus's view, then, Trimble was free to find a new contractor but must still pay for the work Simplus did at Trimble's behest.

After a three-day trial and post-trial briefing, the Court sees merit in both parties' positions. Simplus is correct that Trimble can't just ignore the invoices for services that had been performed but not paid for at the time Trimble fired Simplus.

The parties' governing contract limited the time Trimble had to challenge Simplus's invoices and instructed that termination of the contract didn't terminate Trimble's payment obligation. And Delaware law doesn't permit an aggrieved party to countenance a material breach and then squeeze a little more performance out of the breacher before voiding the contract. Accordingly, Simplus has a right to recover for its unpaid invoices. There is a caveat, though.

Choosing to continue performance of a contract despite a material breach does not waive all claims related to the breach. Rather, the non-breaching party retains the ability to sue for damages to remedy the breach. Since the Court is convinced that Simplus breached, Trimble can collect certain damages.

That leaves the issue of fixing Trimble's damages. Trimble suggests two alternative measures: overpayments to Simplus, or the cost to have a third party finish the project. While those are both viable metrics, factual issues prevent Trimble from recovering all that it seeks.

Starting with the overpayments, they comprise loss-in-value damages. But Trimble didn't prove how much Simplus's deficient performance was worth. Instead, Trimble relies on a conclusory internal assessment that said Simplus only provided only a total of "~1.4M" worth of "acceptable" work. Besides the fact that the Court doesn't follow how Trimble arrived at that number, Simplus provided over $1.5 million in work under a contract that has never been challenged. So Trimble's

"~1.4M" figure is necessarily a significant underestimate. The Court cannot rely upon damages evidence that is so facially flawed. Nor can the Court just guess at the true value of Simplus's services. Thus, the Court can't award loss-in-value damages here.

The cost of completion metric can be a workable alternative to loss in value. Trimble, though, omits a critical fact: Trimble never paid Simplus to complete the project. Instead, since Simplus was billing on a time-and-materials basis, it would have cost an estimated $3.4 million to have Simplus finish the job. Measuring contract damages requires subtracting any avoided costs from the award, so Trimble's award consists of the $4 million it paid to have the project finished minus the $3,363,156 it avoided paying to Simplus. The resulting $636,844 will be set off against the amount Trimble owes Simplus for unpaid invoices.

The Court recognizes that had Trimble proved the loss in value of Simplus's deficient service or the cost to fix Simplus's deficiencies, Trimble would almost certainly receive a greater award. But Trimble didn't. Trimble submitted weak evidence on this issue and proposed two awards that would have been windfalls. That being so, the Court is constrained to limit Trimble's award to the only figure that is grounded in the evidence.

## II. THE TRIAL

Trial took place over three days. The record consists of 255 exhibits, ten deposition transcripts, and live testimony from eleven fact witness, as well as the facts stipulated to by the parties.[1]

## III. FINDINGS OF FACT

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law. So, to the extent that any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[2]

### A. THE PROJECT

Trimble is an industrial technology conglomerate.[3] But Trimble's various businesses each had their own way of doing things.[4] So, a customer who wanted to buy products from multiple Trimble divisions would have to deal with each division

---

[1] This decision cites to: trial exhibits ("JX #"); the trial transcript ("Day # Tr."); deposition transcripts ("[Last Name] Dep. Tr."); and the stipulated facts set forth in the Pretrial Stipulation and Order ("PTO"). The witnesses in order of appearance were: Shayne Fisher, Randolph West, David Boulanger, Chris Armstrong, Paul Cardosi, Claude Chassot, Pamela Langley, Sandeep Dhond, Francisco Javier Reynoso, Mark Schwartz, and Alison Millar.

[2] *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authorities).

[3] PTO ¶ 34.

[4] Day 2 Tr. at 177.

separately.[5] Paul Cardosi, a Trimble executive,[6] envisioned a better way.[7] Instead of customers going directly to each division to purchase that division's products, Mr. Cardosi wanted to create a unified platform for all of Trimble's products.[8] The new plan also involved Trimble's businesses replacing the sale of perpetual licenses with sales of subscriptions and term licenses.[9] Trimble dubbed this endeavor the Illuminate Project (the "Project").[10]

Trimble chose Salesforce, a third-party software company, to provide the digital foundation for this newly conceived system.[11] But even for a sophisticated tech company like Trimble, weaving together multiple separate businesses into a single, streamlined Salesforce application is no easy task. So Trimble needed help.[12] Trimble sought an "implementation partner" that had specialized knowledge of this type of project and came with Salesforce's highest recommendation.[13] Trimble

---

[5] *Id.*

[6] *Id.* at 130-31. At the time of trial, Mr. Cardosi was a vice president of "Trimble Incorporated." *Id.* at 130. During the relevant period, Mr. Cardosi was the director of finance and then vice preside of finance "for a group of business called Trimble Buildings." *Id.* at 130-31.

[7] *Id.* at 131-32.

[8] *Id.* Specifically, this project pertained to "Trimble Buildings"—a subset of Trimble—and was limited in scope to France and the Benelux region. *Id.* at 180. For simplicity's sake, and because it has no bearing on the dispute, this decision will use "Trimble" to refer to both Trimble Incorporated and its subsidiaries, unless otherwise specified.

[9] *Id.* at 177.

[10] *Id.* at 131.

[11] *Id.* at 132-33.

[12] *Id.* at 132.

[13] *Id.* at 133.

found Simplus.[14]

## B. THE MCSA

Trimble and Simplus cemented their relationship with a Master Consulting Services Agreement dated April 1, 2020 (the "MCSA").[15] That document contains the key terms governing this dispute. For Trimble, the most important parts of the MCSA are the obligations it imposes on Simplus—particularly the assurances regarding the quality of Simplus's work. In that regard, MCSA Section 3.1 states:

> [Simplus] will use [Simplus]'s best efforts, knowledge and experience to perform the Services and tender the Deliverables meeting the acceptance criteria on or before the deadline set forth in the applicable Statement of Work, unless delayed or prevented due to Trimble's default under this Agreement, in which case any applicable Service (and any compensation therefor), acceptance criterion or deadline shall be equitably modified, deleted or extended.

MCSA Section 9.2 adds:

> [Simplus] warrants that the Services shall be rendered and Deliverables shall be produced to the best of [Simplus]'s abilities, knowledge and experience, shall be timely, professional and workmanlike, shall comply with the applicable Statement of Work and shall meet or exceed applicable standards in [Simplus]'s industry.

MCSA Section 9.10 presciently contemplates remediating defects, providing:

> [Simplus] shall, without charge, correct any non-conformity, defect or malfunction in any Deliverable as discovered during each appli[c]able user acceptance testing in the Statement of Work, or as reported by Trimble within 30 days of receipt of notice from Trimble, or within a

---

[14]   *Id.*

[15]   JX 4 (hereinafter "MCSA").

mutually agreed upon time frame or, if [Simplus] is unable to make the Deliverable operate as warranted within such period, then Trimble may extend the period for a reasonable time or, alternatively, terminate immediately the applicable Statement of Work. The remedies set forth in this Section 9.10 shall be non-exclusive.

Simplus has a different view on which provisions of the MCSA are most important to this contest. Simplus points at the portions that govern how Simplus gets paid.

Simplus relies most heavily on MCSA Section 5.1, which states: "Unless otherwise expressly specified on a Statement of Work, (i)[16] all payments are due in U.S. Dollars within 45 days of Trimble's receipt of an undisputed invoice." Simplus also relies upon MCSA Section 6.3: "If this Agreement is terminated, [Simplus] is entitled to be paid any unpaid Compensation earned for authorized activities performed before the date of termination, and to be reimbursed for prior approved expenses incurred before the date of termination, but to no other compensation." Regarding termination, MCSA Section 6.2 reads in pertinent part:

Trimble may terminate this Agreement or any Statement of Work any time for its convenience, effective upon thirty (30) days prior written notice to [Simplus]. Either party may terminate this Agreement if the other party: (a) fails to cure any material breach of this Agreement within 30 days after written notice of such breach[.]

Perhaps most importantly at the time of contracting, the MCSA called upon

---

[16] Although the inclusion of this romanette suggests the beginning of the list, there is none. MCSA Section 5.1 is quoted in its entirety here.

the parties to enter "individual Statement[s] of Work(s)" to more comprehensively arrange the exact work Simplus was to perform for Trimble.[17]

## C. THE SOWS

Guided by the MCSA, the parties entered the first Statement of Work ("SOW") in July 2020.[18] This was the "Salesforce Planning" SOW.[19] This contract goes into detail about precisely how Simplus would get ready for the Project. The key points are that Simplus had to learn about Trimble's businesses and what exactly Trimble wanted to accomplish with the Project, then Simplus had to figure out how to make that happen.[20] Simplus was to be paid on a "time and materials" basis under this SOW.[21]

After a promising planning stage,[22] Trimble kept Simplus on to carry out the plan. To that end, Trimble and Simplus executed three new SOWs in December 2020: the "Illuminate" SOW;[23] the "Integration" SOW;[24] and the "Migration" SOW.[25] Each of these SOWs detailed the parties' respective obligations with regard

---

[17]  MCSA § 2.1.

[18]  *See* JX 6.

[19]  *Id.* at 7722.

[20]  *Id.* at S7726-33.

[21]  *Id.* at S7745.

[22]  Day 3 Tr. at 17-18.

[23]  JX 42C.

[24]  JX 42B.

[25]  JX 42A.

- 8 -

to different aspects of the Project.  The Illuminate SOW dealt with the primary task of building and eventually "going live" with the Salesforce infrastructure.[26]  The Integration SOW laid out how to make Trimble's existing software systems get along with Salesforce's software.[27]  And the Migration SOW pertained to moving Trimble's existing data into the new system.[28]  As with the Salesforce Planning SOW, Simplus's payment under these three SOWs would be billed on a time-and-materials basis.[29]

Among the litany of obligations contained in the SOWs, Simplus promised to "organize a project team skilled to deliver the scope of the project" and to "make every reasonable attempt to ensure that all individuals assigned to th[e] project remain engaged throughout the duration."[30]  Trimble, for its part, promised to provide the data Simplus would need to complete the Project and acknowledged that failing to do so timely would delay the Project.[31]

### D. SIMPLUS'S PURPORTED BREACHES

The Project, and the parties' relationship, benefitted from an auspicious start. But harmonious performance leading to a successful product launch is rarely the

---

[26]  JX 42C at S13783-91.

[27]  JX 42B at S13766-68.

[28]  JC 42A at S13748-51.

[29]  *Id.* at S13759; JX 42B at S13775; JX 42C at S13812.

[30]  JX 6 at S7737; JX 42A at S13755; JX 42B at S13772; JX 42C at S13807.

[31]  *See* JX 42C at S13796, S13813.

topic of a post-trial judicial decision.  Instead, the good feelings that existed at the end of 2020 dissipated by mid-2021.  Trimble blames Simplus for that.  Trimble says Simplus failed to hold up its end of the bargain, leading to deleterious delays and excessive expenses.  Trimble takes specific exception to three areas of Simplus's performance:  (1) the quality of Simplus's coding; (2) the adequacy of Simplus's Project management; and (3) Simplus's efforts to retain key personnel.[32]

### 1.  Defective Coding

"Technical debt" was a central motif in Trimble's presentation.  As Shayne Fisher, a senior technical architect at Simplus,[33] described it, technical debt relates to imperfections or "clutter" within software that is generated when a piece of code is changed, when multiple pieces of code are combined, or when a coding error is made.[34]  That clutter can cause latent problems and needs to be cleaned up "before you have a complete working product."[35]

Like household clutter or financial debt, the best practice is to get rid of technical debt quickly instead of letting it build up.[36]  That didn't happen, though. Instead, remediating the technical debt was "put aside" until the late stages of the

---

[32]  Trimble's Post-Trial Opening Brief (hereinafter "Trimble's Open. Br.") at 19-20 (D.I. 62).

[33]  Day 1 Tr. at 26.

[34]  *Id.* at 74-75.

[35]  *Id.* at 75.

[36]  *Id.* at 157.

- 10 -

Project, even though it was supposed to be done regularly throughout the Project.[37] That put the rationale for the best practice on display.

By the time Simplus got around to tackling the technical debt problem, the entire Project was afflicted and Simplus's efforts to go back and fix the hundreds of individual defects stalled progress on the rest of the Project.[38] As Simplus's postmortem "Retrospective/Lessons Learned" report stated, putting off technical debt until near the end of the Project was a key factor in causing "Development velocity" to "drop to almost zero" by the summer of 2021.[39]

Allowing technical debt to accumulate was not Simplus's only coding-related misstep. Simplus also failed to ensure that its offshore development team—the Philippines Development Center (the "PDC")—followed best practices. To prove this point, Trimble had to look no further than Simplus's Lessons Learned report, which stated, "PDC did not follow Best Practices in Development."[40] That was no small oversight considering the PDC and other offshore contractors did the large majority of the "hands-on keyboard development" for the Project.[41] In the end, Simplus concluded, "[t]he Delivery Model for the PDC Team needs significant

---

[37] JX 233 at S37437.

[38] Day 1 Tr. at 118-19; JX-157.

[39] JX 233 at S37434.

[40] *Id.* at S37422.

[41] Day 1 Tr. at 100.

changes[] to be able to accommodate Enterprise Client development projects."[42] That belated realization was of no help to Trimble.

## 2. Substandard Project Management

A failed project bodes ill for the project's manager. That made Simplus's project manager, David Boulanger,[43] an easy target for Trimble's ire. And, indeed, Trimble was not pleased with Mr. Boulanger. Pamela Langley, Mr. Boulanger's counterpart at Trimble,[44] rated Mr. Boulanger's performance as "subpar."[45] Ms. Langley specifically critiqued Mr. Boulanger for repeatedly rearranging the tasks to be completed in each development stage, something she described as "bad form" that "should never" be done.[46] Doing so, Ms. Langley testified, created confusion and inefficiency, which increased costs.[47] Mr. Boulanger also shoulders the blame for planning development stages—called "sprints" in industry parlance— that were "overloaded" with tasks.[48] As a result, completion of the sprints was hard to track, and some sprints weren't completed on time.[49]

---

[42] JX 233 at S37432.

[43] Day 2 Tr. at 6.

[44] Day 3 Tr. at 92.

[45] *Id.*

[46] *Id.* at 93-94.

[47] *Id.* at 95.

[48] *Id.* at 94; JX 233 at S37422.

[49] JX 233 at S37422; JX 242 at S39595.

Ms. Langley also criticized Mr. Boulanger's management of the shared software development tool, JIRA, which kept track of the thousands of discrete tasks that comprised the Project.[50] According to Ms. Langley, Mr. Boulanger would make unexplained changes in JIRA, which then forced others to spend time figuring out why the changes were made.[51] Along the same lines, certain technical documents were incorrectly attached to JIRA entries; that hindered Trimble's ability to do its portion of the work until Simplus corrected the issue.[52] Ms. Langley also accused Mr. Boulanger of deleting JIRA entries—a taboo among "seasoned" JIRA users— which led Trimble to remove the entire team's ability to delete entries.[53] Trimble even asked Simplus to remove Mr. Boulanger as project manager, but Simplus's leadership chose to maintain the status quo.[54]

Simplus may not have acquiesced to pulling Mr. Boulanger from the Project, but that doesn't mean Simplus's leadership was happy with Mr. Boulanger's performance. For example, Simplus's Lessons Learned report calls out the poorly planned sprints as a problem.[55] Moreover, Mr. Boulanger's annual review for the relevant period was far from glowing—quite the opposite. Mr. Boulanger's "Final

---

[50] Day 3 Tr. at 95-96.

[51] *Id.* at 95-96.

[52] *Id.* at 98.

[53] *Id.* at 99-101.

[54] *Id.* at 110-11.

[55] JX 233 at S37422.

Score" on that review indicated "Below Expectations."[56]  While Mr. Boulanger was complimented on his personality and work ethic, the sprint planning deficiencies came up yet again.[57]  Mr. Boulanger's manager, Michael Thomas, added that Mr. Boulanger had issues with communication, including "[t]rying to sell a different narrative than reality."[58]  Mr. Thomas lamented in his "Overall Comments":

> This was a tough year.  No doubt about it.  There were certainly positive comments about [Mr. Boulanger] on Trimble that are captured [in the annual review], but the two negatives are that the sprints were overloaded (very critical part of Project Management) and Simplus was ultimately fired with potential litigation.  This has a huge impact on us as a company, and even though [Mr. Boulanger] doesn't carry all responsibility for the outcome, you can't ignore the accountability of project failure for the person responsible for managing it.[59]

### 3. Departures of Key Personnel

Trimble also faults Simplus for not doing enough to keep its key personnel. For support, Trimble points to the departure of four "team leads":  Kim Draeger Arries; Sushi Mulugu; Lars Olsen; and Vivian Ralls.[60]  Simplus largely attributed these losses to burnout among its staff.[61]  The departures concerned Trimble because on-boarding new talent takes time—time that delayed the Project and increased

---

[56]  JX 242 at S39593.

[57]  *Id.* at S39594-95.

[58]  *Id.* at S39595.

[59]  *Id.* at S39596.

[60]  Trimble's Open. Br. at 20-23.

[61]  *See* Day 1 Tr. at 209; JX 233 at S37423.

Trimble's costs.[62]

Simplus made some efforts to try to maintain its personnel. For one, Mr. Boulanger testified that he checked in with the team leads every two weeks to "take their temperature" and look for ways to mitigate burnout.[63] And in response to Trimble's turnover concerns, Simplus's project lead, Randy West,[64] suggested a "meaningful go-live bonus to encourage people to stay."[65] That bonus didn't go as conceived, though. Rather, in August 2021—months after Mr. West shared his idea—Simplus announced a spot bonus untethered to any obligation to stay at Simplus.[66]

But Simplus's grandest gesture with respect to remedying the turnover wasn't aimed at Simplus's employees; it was aimed at Trimble. Specifically, in May 2021, Simplus credited Trimble $110,500 worth of non-billable hours "for the impact of the 'Unplanned Departures.'"[67] Trimble appeared satisfied with that credit and never asked for more.[68]

---

[62] *See* JX 62; JX 79.

[63] Day 2 Tr. at 23-24.

[64] Day 1 Tr. at 174.

[65] JX 79 at 24442.

[66] JX 204.

[67] JX 82 at S24834.

[68] *Id.*; Day 3 Tr. at 64-65.

### E.  TRIMBLE REMOVES SIMPLUS FROM THE PROJECT AND HIRES PwC.

As the issues with Simplus's performance festered during the summer of 2021, Trimble lost faith.  By August 2021, Trimble's leadership planned to remove Simplus from the Project.[69]  Mr. Cardosi, Trimble's pioneer behind the Project, testified that he lost confidence in Simplus due to the turnover issues, the low-quality code, and the increasing costs to reach go-live.[70]

On August 11, 2021, Trimble told Simplus to stop working on the Project.[71] In Simplus's internal email relaying that message to its employees, Simplus's leadership portrayed the decision as Trimble "changing the direction of the project to have a more global focus" and "decid[ing] to engage a global systems integrator instead of Simplus."[72]  Not so, says Mr. Cardosi.  Mr. Cardosi testified that he candidly told Simplus's leadership that Trimble doubted Simplus's ability to complete the Project.[73]

With Simplus fired, Trimble was left to wonder what to do with its partially built sales platform.  To help gauge its options, Trimble asked PricewaterhouseCoopers ("PwC") to perform a necropsy on the Project and estimate

---

[69]  Day 2 Tr. at 170-71.

[70]  *Id.* at 170.

[71]  *Id.* at 171; *see also* JX 255.

[72]  JX 255.

[73]  Day 2 Tr. at 174-75.

the cost to complete it.[74]  Trimble chose PwC for that task because PwC had written the "global playbook" Trimble was following, so PwC already had some familiarity with Trimble and the Project.[75]  PwC then performed a "comprehensive assessment" of the work Simplus had done.[76]

PwC concluded that "approximately 70 percent of the business capabilities needed to run Trimble's business were complete across the end-to-end process and complete meaning they had been developed and tested and were ready to move into production."[77]  But while the capabilities were built, they were infected by bugs and therefore didn't work as designed.[78]  PwC planned a four-sprint process during which PwC could finish the project by "enhanc[ing] what was done before," "complet[ing] the work that hadn't been started," or "rebuild[ing] the work that had been started."[79]  That worked for Trimble.  So in September 2021, Trimble hired PwC to pick up where Simplus left off.[80]  Trimble ultimately paid PwC $4 million to finish the Project.[81]  Trimble's reimagined sales platform finally went live in

---

[74]  Day 3 Tr. at 175.

[75]  *Id.* at 175.

[76]  *Id.* at 199.

[77]  *Id.* at 200.

[78]  *Id.* at 201.

[79]  *Id.* at 214.

[80]  *Id.* at 178.

[81]  *Id.* at 217.

February 2022.[82]

## IV. THIS LITIGATION AND THE PARTIES' CONTENTIONS

Simplus initiated this litigation in November 2021.[83] Simplus doesn't challenge Trimble's decision to fire it; but Simplus does seek payment of roughly $2 million worth of invoices from the late stages of the Project.[84] Simplus brought three causes of action: (1) breach of contract, (2) account stated, and (3) alternatively, unjust enrichment.[85] Before answering the Complaint, Trimble successfully moved for the dismissal of the account stated claim.[86]

When Trimble answered the Complaint, it brought two counterclaims.[87] One sought a declaration that Simplus wasn't entitled to payment on the invoices; the other is a breach-of-contract claim against Simplus.[88]

Trial took place over three days from October 16 to 18, 2023.[89] Both parties

---

[82] *Id.* at 217.

[83] *See* Complaint (D.I. 1).

[84] *Id.* ¶ 1.

[85] *Id.* ¶¶ 8-47.

[86] Memorandum Opinion and Order dated August 24, 2022 (hereinafter "MTD Op.") (D.I. 29) (*Outbox Systems, Inc. v. Trimble Inc.*, 2022 WL 3696773 (Del. Super. Ct. Aug. 24, 2022)).

[87] Trimble's Answer and Counterclaims (D.I. 32).

[88] *Id.* ¶¶ 35-44.

[89] Trial Worksheet (D.I. 56).

submitted an opening brief[90] and a reply brief[91] following the trial.

Simplus requests an award of $2,123,660.98 for unpaid invoices.[92] Trimble requests either $3,572,662.98 to reflect its supposed overpayment to Simplus, or $4 million to reflect the cost to complete the Project.[93]

## V. GENERAL LEGAL PRINCIPLES

Though the Court sits without a jury, it has applied the same principles of law in its deliberations and consideration of each individual claim and counterclaim that it would have more formally instructed a jury to follow. The Court may in this writing highlight some of those most applicable to this particular case. But the fact that some particular point or concept may be mentioned here should not be regarded as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claims, counterclaims, and defenses.

In reaching its verdict, the Court has examined all exhibits submitted and considered the testimony of all witnesses, both direct and cross, live and by deposition. The Court has also considered the applicable Delaware case law that has

---

[90] *See* Simplus's Post-Trial Opening Brief (hereinafter "Simplus's Open. Br.") (D.I. 61); Trimble's Open. Br.

[91] *See* Simplus's Post-Trial Reply Brief (hereinafter "Simplus's Reply Br.") (D.I. 63); Trimble's Post-Trial Reply Brief (hereinafter "Trimble's Reply Br.") (D.I. 64).

[92] Simplus's Open. Br. at 34.

[93] Trimble's Open. Br. at 34.

defined the legal precepts applicable to the claims and defenses the parties have forwarded. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits and only used for its deliberation that which would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial and during the trial proceedings. And, of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

The Court then reviewed and applied some of the very instructions that it would give a jury in these circumstances.[94]

## VI. ANALYSIS AND FINDINGS

Most simply, the parties' respective positions ask the Court to settle two interrelated questions. First, whether the unpaid invoices suffice to establish that Simplus is entitled to a final payment from Trimble. Second, whether Simplus breached either the MCSA or the SOWs such that Trimble can recoup money from Simplus. The Court will address each in turn. Before getting to the substance, though, it's worthwhile to reflect on the key points of law guiding this analysis.

"Under Delaware law, plaintiffs must establish the following three elements to succeed on a breach-of-contract claim: (1) the existence of a contract, whether

---

[94] *See, e.g.,* Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony).

express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach."[95]  Delaware law requires courts "to enforce the plain and unambiguous terms of a contract as the binding expression of the parties' intent."[96]  Delaware courts are stalwart in this approach.  "Even if the bargain [the parties] strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written."[97]  When one party to a contract is confronted with its counterparty's material breach, the non-breaching party can either cancel the contract and sue for total breach or continue the contract and sue for partial breach.[98]

## A. SIMPLUS IS FACIALLY ENTITLED TO PAYMENT ON THE UNPAID INVOICES.

A threshold question in this litigation is whether Simplus has established that Trimble must pay the outstanding invoices.  The answer to that question has two parts.  First, Simplus must show that Trimble has a contractual duty to pay the invoices.  Second, Simplus must show that Trimble's performance is not excused by Simplus's own material breach.  On the first question, Simplus succeeds: the MCSA requires Trimble to pay the invoices.  On the second question, Simplus succeeds

---

[95]  *GEICO Gen. Ins. Co. v. Green*, 2022 WL 1052195, at *5 (Del. Apr. 8, 2022) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[96]  *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1105 (Del. Ch. 2012) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

[97]  *Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*, 2023 WL 4571932, at *7 (Del. Ch. July 17, 2023) (quoting *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021)).

[98]  *Agahi v. Kelly*, 2024 WL 1134048, at *6 (Del. Super. Ct. Mar. 15, 2024) (citations omitted).

again but with a caveat: Trimble's election to have Simplus continue performance up until August 11, 2021, precludes Trimble from completely reneging on its obligations, but Trimble can still recover damages for any breach by Simplus. The reasons for these conclusions follow.

### 1. Trimble did not Timely Dispute the Invoiced Amounts.

Two provisions of the MCSA command that Trimble owes Simplus the invoiced amounts. Under MCSA Section 5.1, "all payments are due in U.S. Dollars within 45 days of Trimble's receipt of an undisputed invoice." In effect, that gives Trimble forty-five days to dispute an invoice. MCSA Section 6.3 provides: "If this Agreement is terminated, [Simplus] is entitled to be paid any unpaid Compensation[99] earned for authorized activities performed the date of termination." In other words, Trimble wasn't allowed to stiff Simplus on work Simplus already performed by terminating the MCSA. So, at bottom, the pivotal question is whether Trimble disputed the invoices within forty-five days. Trimble did not.

Trimble's failure to dispute the invoices is displayed by what Trimble tries to pass off as a dispute. Instead of pointing to any suggestions by Trimble that it intended to withhold payment or otherwise doubted Simplus's entitlement to renumeration, Trimble relies on general expressions of Trimble's dissatisfaction

---

[99] Despite the capitalization, "Compensation" is not a defined term in the MCSA.

with Simplus's work.[100]  Trimble's supposed smoking gun in this regard is a July 15, 2021 email sent by Mr. Cardosi, in which he wrote:

> Every date we get comes and goes and we never hit deadline and deliverable.  The Nov 1 go live is not guaranteed and as we cut corners and keep reducing scope.  How do I avoid an open check book that leads to perpetual work that never gets to the finish line[?]
>
> I am asking basically how do I get some accountability for the price you are asking me to pay?[101]

The Court fails to see where in that message Mr. Cardosi disputes an invoice. Voicing displeasure and asking for accountability is not the same as challenging Simplus's right to payment.[102]  Rather, in the Court's view, Trimble aims to rewrite history by characterizing Mr. Cardosi's email as disputing an invoice even though that isn't what Mr. Cardosi meant or did.  Indeed, just one week after Mr. Cardosi sent that email, Trimble paid over $400,000 worth of Simplus invoices.[103]  That's not much of a dispute.

---

[100]  Trimble's Open. Br. at 13-14.

[101]  JX 135 at S34361.

[102]  Trimble bases its loose definition of a dispute on a snippet of *Immedient Corp. v. Healthtrio, Inc.* in which this Court said a party failed to dispute an invoice "when it did not contemporaneously object to the manner or cost of the invoiced work." 2005 WL 1953027, at *1 (Del. Super. Ct. June 22, 2005).  But Trimble overreads that sentence when it concludes that any complaint about the manner of a counterparty's work qualifies as disputing an invoice. *Immedient*, though factually analogous in many ways, had little occasion to precisely define a disputed invoice because the non-payer in that case had actually complimented the contractor's work prior to litigation.  *Id.* at *9.  What's more, *Immedient*'s ultimate holding rested on an application of California's law, not Delaware's.  *Id.* at *3.

[103]  JX 244 at T78947.

The Court is reticent to lay down a definition of "dispute" in this context because what might qualify as such is driven by the idiosyncrasies of the parties' relationship. But the Court is satisfied that Trimble's complaints, which were punctuated by the timely payment of invoices, are not what the parties had in mind when they drafted MCSA Section 5.1. As Trimble itself points out, Mr. Cardosi began questioning Simplus's performance as early as March 2021.[104] Yet Trimble paid all of Simplus's invoices up until July 22, 2021.[105] Those facts just don't align with Trimble's theory that expressing displeasure with Simplus's work equated to contesting Simplus's right to payment.

Trimble's other arguments don't change the result. For one, Trimble raises the Court's decision on Trimble's partial motion to dismiss to suggest that the forty-five-day dispute period does not limit Trimble's ability to dispute the invoices now.[106] Not so. In its previous opinion, the Court concluded that Simplus could not pair Section 5.1 with an account stated claim to circumvent this state's well-honed breach-of-contract principles.[107] That remains true; but the Court by no means excised Section 5.1 from the MCSA. Rather, while Trimble retains the protections afforded by Delaware contract law—most pertinently, the requirement that Simplus

---

[104] Trimble's Open. Br. at 14 n.2; JX 63.

[105] JX 244.

[106] Trimble's Open. Br. at 15-16.

[107] *See* MTD Op. at 25-29.

itself performed—Trimble's right to directly challenge the invoiced amounts sunsetted pursuant to the MCSA's plain terms.

Nor is the Court persuaded that Trimble's obligation to timely dispute the invoices was nullified by the invoices' lack of substantive details.[108]  The Court accepts that Trimble may have been disadvantaged by being contractually required to dispute invoices with forty-five days when the invoices didn't provide many specifics to dispute.[109]  But litigation is not an arena in which to bargain for new terms.[110]  Trimble's concern would have been better raised when the MCSA was negotiated in early 2020.  Barring that, Trimble could have brought it up in response to any one of the dozens of invoices that Trimble approved and paid.  Trimble didn't do so.  Instead, Trimble waited until it had reason to evade Section 5.1 to bemoan this supposed inequity.

Accordingly, the unpaid invoices represent a fixed amount that Trimble was

---

[108]  Trimble's Open. Br. at 12-13.

[109]  *See, e.g.*, JX 250.2.

[110]  *See CFGI, LLC v. Common C Hldgs. LP*, 2024 WL 325567, at *10 (Del. Super. Ct. Jan. 29, 2024) (explaining that Delaware courts will not "rewrite a contract to appease a party" who later believes it got a bad deal, and Delaware courts are hesitant to imply terms that could have easily been provided expressly (citations omitted)).  In opposition, Trimble cites *AssuredPartners of Va., LLC v. Sheehan*, 2020 WL 2789706, at *9 (Del. Super Ct. May 29, 2020).  There, this Court allowed an implied covenant claim to survive a motion to dismiss where the plaintiff argued that obtaining "truthful and accurate information" about an earnout calculation was implied in the plaintiff's right to object to the earnout calculation.  *Id.*  Putting aside the wide gap between the standards applicable at the pleading stage versus post-trial, the dozens of invoices that Trimble approved without detailed information belies Trimble's claim that Trimble retained some implied right to detailed information.

obligated to pay under MCSA Section 5.1. MCSA Section 6.3 confirms that the termination of the MCSA did not cut off Simplus's right to the collect on those invoices. The only remaining question, then, is whether Simplus forfeited its right to collect by materially breaching the MCSA or SOWs.

## 2. Simplus's Award will be Reduced by Damages to Trimble Caused by Simplus's Breaches of the MCSA or SOWs.

Notwithstanding Sections 5.1 and 6.3, Simplus could lose its right to enforce the MCSA against Trimble if Simplus itself was in breach.[111] So, says Trimble, "Simplus is only entitled to be paid for work that it performed using its best efforts, knowledge, and experience, that it provided in a timely and workmanlike manner, and that met or exceeded industry standards."[112] If only it were so simple.

An exception to the general rule that a material breach excuses the nonbreaching party's performance exists where the nonbreaching party chooses to maintain its benefits under the contract.[113] Or, more fully:

> Where there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and *conduct indicating an intention to continue the contract in effect will constitute*

---

[111] *See Goyal v. Cognosante, LLC*, 2023 WL 8525128, at \*14 n.182 (Del. Super. Ct. Nov. 29, 2023) ("A party is excused from performance under a contract if the other party is in material breach thereof." (quoting *ITG Brands, LLC v. Reynolds Am., Inc.*, 2023 WL 6383240, at \*20 (Del. Ch. Oct. 2, 2023))).

[112] Trimble's Open. Br. at 33; *see also id.* at 15 n.3.

[113] *In re Mobilactive Media, LLC*, 2013 WL 297950, at \*14 (Del. Ch. Jan. 25, 2013) (quoting *DeMarie v. Neff*, 2005 WL 89403, at \*5 (Del. Ch. Jan. 12, 2005)).

*a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform.* In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.[114]

As applied here, that means that to the extent Trimble kept Simplus working despite Simplus's deficiencies, Trimble can't say it has no obligation to pay for that work.

It is apparent that Trimble sought to forge ahead with Simplus through the summer of 2021 notwithstanding the problems with Simplus's performance. It follows that Trimble can't now claim it has no obligation to pay for that work.

In spring 2021, Trimble already had issues with Simplus's performance. For example, on March 31, 2021, Mr. Cardosi sent an email asking Simplus about the "story burn down graph" and Simplus's "staff turnover."[115] Mr. Cardosi explained at trial that the "story burn down graph" essentially shows the pace at which tasks were being completed.[116] Mr. Cardosi testified that he sent this email in response to a lack of "accurate transparency and visibility" from Mr. Boulanger, as well as "clearly very little progress" on the tasks assigned to Simplus.[117] So, by the end of

---

[114] *Id.* (emphasis in original) (quoting 14 *Williston on Contracts* § 43:15 (4th ed. 2004))

[115] JX 63.

[116] Day 2 Tr. at 145.

[117] *Id.* at 145-46.

March 2021, Mr. Cardosi was already dissatisfied with Simplus's ability to retain its staff, Simplus's coding efforts, and Simplus's project management.

Mr. Cardosi more pointedly questioned Simplus's compliance with the SOWs in a May 7, 2021 email, which asked: "When we meet next week can you talk about why there is such high turnover on the Simplus side and how you are mitigating this risk? . . . Is Simplus doing anything to secure the remaining lead people on the Illuminate project?"[118] Despite the frank question, Mr. Cardosi never got a "straight answer" from Simplus about the turnover problems.[119]

Likewise, Mr. Boulanger's supposedly substandard performance was known to Trimble well before August 2021. The alleged deletion of JIRA entries occurred in "early 2021."[120] And Mr. Boulanger's practice of adding items mid-sprint began by at least April 2021.[121] The problem of overloaded, and resultingly unfinished, sprints was present at that time, too.[122]

Even the technical debt and coding issues were apparent long before Trimble pulled the plug. On June 14, 2021, for example, Trimble employees flagged that previously working functions began failing as new code was added.[123] That concern

_____

[118] JX 78 at S24422.

[119] Day 2 Tr. at 148-49.

[120] Day 3 Tr. at 111.

[121] *See* JX 80.

[122] *Id.*

[123] JX 105 at T26969.

was then raised to Simplus.[124] Mr. Fisher testified that around this time there were "hundreds of technical debt issues afflicting the project."[125]

Trimble's outlook on Simplus only deteriorated from there. On July 15, 2021, Mr. Cardosi sent his email complaining that "[e]very date we get comes and goes and we never hit deadline and deliverables."[126] The next day, Trimble employees, including Ms. Langley, had and internal discussion on Simplus's dilatory progress on the Project.[127] One of the Trimble employees, Anne Shaffer, even commented, "we should be concerned and it's time to be realistic about the scope of what will be delivered in Sept. . . . It seems to be impossible, at this point, for all scheduled user stories from Sprint 8 to complete by the end of August."[128] Even with those realizations, Trimble still waited nearly another month to tell Simplus to stop working.

The upshot of this timeline is that Trimble continued Simplus's performance even though Trimble was aware of the problems it now claims were material breaches. That circumstance precludes Trimble from entirely shirking the bills for that work.[129] It doesn't mean, though, that Trimble has to pay for Simplus's work

---

[124] *Id.*

[125] Day 1 Tr. at 109.

[126] JX 135 at S34361.

[127] JX 154.

[128] *Id.* at T40858.

[129] *See In re Mobilactive*, 2013 WL 297950, at *14.

in full. Rather, Trimble retained the right to recover damages for Simplus's breach. Accordingly, Trimble is still obligated to pay for Simplus's services, but Trimble can reduce its obligation in an amount commensurate with the damage caused by Simplus's breach.

### B. SIMPLUS'S AWARD IS REDUCED BY THE ADDITIONAL COST TRIMBLE INCURRED IN HAVING PwC COMPLETE THE PROJECT.

In light of the foregoing, Simplus is entitled to payment of its invoices less any damages to Trimble caused by Simplus's breach. So the next questions are: (1) did Simplus breach? and (2) if so, what did it cost Trimble? The first answer is straightforward. Yes. The second answer is tougher.

The Court is convinced that Simplus's deficient performance damaged Trimble. The Court is equally convinced, however, that Trimble hasn't offered a plausible measure of its own damages. Instead, Trimble swung for the fence and came up short.

Since the Court isn't free to guess what fair damages might be, the Court is left to award Trimble what may be an underwhelming award. Trimble is awarded the cost to have PwC finish the Project ($4 million), less the price Simplus would have charged to do the same ($3,363,156). Accordingly, Trimble can offset damages of $636,844 from the outstanding invoices. The reasons for these conclusions follow.

- 30 -

## 1. Simplus Breached the MCSA and SOWs.

Simplus plainly breached its agreements with Trimble. It breached the SOWs by failing to "make every reasonable attempt to ensure that all individuals assigned to th[e] project remain engaged throughout the duration."[130] It breached the MCSA by not performing to the lofty standards promised by MCSA Section 9.2.[131] Simplus's arguments to the contrary fall flat.

### a. Failure to Retain Personnel

Simplus promised to do its best to keep the team together, and yet Simplus's briefing predominantly touts the credentials of the replacement employees.[132] That's besides the point. As is the fact that the departing employees quit Simplus, not just the Project. Nor does the Court buy that asking employees to stay once they announce that they have one foot out the door satisfies "every reasonable attempt" to mitigate turnover. The Court is more concerned with Simplus's proactive efforts to retain its Project-assigned employees.

In that regard, Mr. Boulanger deserves some credit for his bi-weekly check-ins with the team leaders.[133] Redressing burnout is not a monolithic endeavor, so taking an individualized, prophylactic approach was a salutary start to Simplus's

---

[130] JX 42A at S13755; JX 42B at S13772; JX 42C at S13807.

[131] MCSA § 9.2.

[132] Simplus's Open. Br. at 27-28.

[133] Day 2 Tr. at 23-24.

- 31 -

reasonable efforts. But one good idea falls short of "every reasonable effort."

Mr. West had another good idea when he suggested a "meaningful go-live bonus" in May 2021;[134] but Simplus didn't implement it. The last-ditch, no-strings-attached spot bonus Simplus handed out days before Simplus was removed from the Project was a poor substitute. Most problematically, Simplus waited until the Project was in dire straits and Simplus's relationship with Trimble was in the balance to finally try the bonus. In fact, one of the team leads left the Project in the interim between Mr. West's proposal and the spot bonus.[135] Perhaps a pecuniary enticement would have prevented that departure. Relatedly, the spot bonus presumably boosted morale, but it provided no direct incentive to stay on the Project.

Simply put, the Court cannot conclude that Simplus "ma[d]e every reasonable attempt to ensure that all individuals assigned to th[e] project remain engaged throughout the duration" when perhaps the best suggestion for how to do so went unheeded and few alternatives were attempted. Thus, the Court finds that Simplus breached the SOWs by failing to take meaningful, timely actions to retain its Project employees.[136]

---

[134] JX 79 at 24442.

[135] Day 1 Tr. at 221.

[136] The Court notes that the $110,500 credit that Trimble accepted to account for the lost team leads might affect the damages Trimble can claim for this breach. *See* JX 82 at S24834. Because Trimble does not claim damages specific to this breach, however, that issue need not be addressed.

### b. Substandard Performance

The Court is satisfied that Simplus's services were not rendered in conformity with the standards covenanted in the MCSA. The Court finds MCSA Section 9.2 particularly instructive for its strictures that Simplus's services be rendered "to the best of [Simplus]'s abilities, knowledge and experience" as well as "meet or exceed applicable standards in [Simplus]'s industry."[137] For starters, the mired state of the Project at the time of Simplus's removal bespeaks unsound practices. Simplus's own assessment of its performance resolves any doubt.

Perhaps most obviously, Mr. Boulanger's rating of "Below Expectations" on the relevant annual review shows that his performance was not "the best" Simplus had to offer.[138] The botched sprint planning was a common refrain for those assessing the Project's wrong turns.[139] Too, Simplus's "Lessons Learned" report is laden with substandard practices that Simplus acknowledged needed to be redressed.[140] Simplus points out that the Lessons Learned report also comments on Trimble's shortcomings,[141] but the fact remains that the report contains more than a dozen pages of examples of Simplus's failure to adhere to best practices.[142]

---

[137] MCSA § 9.2.

[138] JX 242 at S39593.

[139] *See, e.g., id.* at S39595-96; JX 233 at S37422; Day 3 Tr. at 93-95.

[140] JX 233.

[141] Simplus's Open. Br. at 32-33.

[142] JX 233 at S37422-24, S37428-37.

Simplus's recognition of its deficiencies wasn't limited to the aftermath. For example, on July 20, 2021, Mr. West sent an email saying that Simplus needed, among other things, "[d]evelopers that adhere to the [standard operating procedure]."[143] Around the same time, Simplus determined that it need to "refresh the team (especially the newly onboarded ones) with our standard operating procedures."[144] Developers failing to adhere to Simplus's own standard operating procedures just can't be reconciled with performing "to the best of [Simplus]'s abilities, knowledge and experience."[145]

At bottom, the trial record is replete with observations by Simplus that it was not adhering to best practices. Juxtaposed with the superlative service covenanted in the MCSA, those observations amply demonstrate that Simplus's work fell below the standard they promised. Accordingly, the Court is convinced that Simplus breached the MCSA.

## 2. Trimble Failed to Prove the Damages it Requests, but Trimble is Entitled to the Added Cost of Having PwC Complete the Project.

In the final analysis, the Court finds guidance in the oft-thumbed pages of the Restatement (Second) of Contracts (the "Restatement"), whose methods of

---

[143] JX 155 at S34826.

[144] JX 157 at S38975.

[145] MCSA § 9.2.

measuring damages have been looked upon favorably here in Delaware.[146]  Section 347 of the Restatement describes the "Measure of Damages in General" and explains:

> Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by
>
>> (a)  the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
>>
>> (b)  any other loss, including incidental or consequential loss, caused by the breach,[147] less
>>
>> (c)  any cost or other loss that he has avoided by not having to perform.[148]

Of the limitations contained in Restatement Sections 350 through 353, only Section 352 plays a notable role in this case.  That section provides, "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[149]  Delaware courts apply this rule generously, with an eye toward compensating proven breaches.[150]  But the Court's desire to redress a

---

[146]  *See, e.g.*, *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 n.21 (Del. 2019) (quoting Restatement (Second) of Contracts § 347 cmt. b (1981)).

[147]  The Court has no occasion to consider indirect, incidental, or consequential damages in this case because any right to such damages was waived in the MCSA.  *See* MCSA § 12.

[148]  Restatement (Second) of Contracts § 347 (1981) (hereinafter "Restatement").

[149]  *Id.* § 352.

[150]  *See Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *36 (Del. Ch. July 30, 2021) ("Where the injured party has proven the fact of damages . . . less certainty is required of the proof establishing the amount of damages.  In other words, the injured party need not establish the amount of damages with precise certainty where the wrong has been proven and injury

- 35 -

breach will not lead it to unfounded guesswork or supposition.[151]  Just like any other

element, "[p]laintiffs must prove their damages by a preponderance of the

evidence."[152]

Plaintiffs, though, are not shackled to proving loss-in-value damages.  Instead,

Restatement Section 348 offers "Alternatives to Loss in Value of Performance."[153]

Pertinent here is Section 348(2), which provides:

> If a breach results in defective or unfinished construction and the loss
> in value to the injured party is not proven with sufficient certainty, he
> may recover damages based on:
>
> . . . .
>
> (b) the reasonable cost of completing performance or of
> remedying the defects if that cost is not clearly
> disproportionate to the probable loss in value to him.[154]

---

established." (internal quotation marks omitted) (omission in original) (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015))).

[151] *Id.* ("Responsible estimates that lack mathematical certainty are permissible *so long as the court has a basis to make a responsible estimate* of damages." (emphasis added) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002))); *OptimisCorp v. Waite*, 2016 WL 2585871, at *3 n.11 (Del. Apr. 25, 2016) (noting a trial court sitting as fact-finder "may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." (quoting *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010))); *Id.* ("The law does not permit a recovery of damages which is merely speculative or conjectural." (quoting *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958))).

[152] *See Beard Rsch.*, 8 A.3d at 613 (citing *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *22 (Del. Ch. Jan. 29, 2010)).

[153] Restatement § 348.

[154] *Id.* § 348(2)(b); *see also Council of Unit Owners of Sea Colony East, Phase III Condo. ex rel. Ass'n of Owners v. Carl M. Freeman Assocs., Inc.*, 564 A.2d 357, 360-61 (Del. Super. Ct. 1989) (discussing Restatement § 348(2)(b)).

The Project used binary instead of bricks, but the construction analogy is nonetheless fitting. So, Trimble has three options for measuring damages: (1) the loss in value of Simplus's performance; (2) the reasonable cost of remediation; or (3) the reasonable cost to complete. The Court addresses those options in turn.

### a. Loss-in-Value Damages

Loss-in-value damages are measured by subtracting the value of the breaching party's actual performance from the value of the breaching party's expected performance.[155] Here, the value of Simplus's expected performance—*i.e.*, what Simplus's work would have been worth if done to the covenanted standard—is shown by the total amount Simplus invoiced.[156] Measuring the value of Simplus's performance as rendered is less simple.

In its proffered calculation, Trimble relies on two pieces of evidence. The first is a technical analysis performed by Trimble's business systems director, Mr. Dhond.[157] Mr. Dhond reviewed the critical data, most particularly JIRA records, and evaluated how close each component of the Project was to completion.[158] That analysis was then passed to Trimble's strategic sourcing manager, Francisco Javier

---

[155] *See Leaf Invenergy*, 210 A.3d at 695 (citing Restatement § 347 cmt. b).

[156] PTO ¶ 42.

[157] JX 246; Day 3 Tr. at 116.

[158] Day 3 Tr. at 126, 136.

Reynoso.[159]  Mr. Reynoso summarized Mr. Dhond's findings in an email that now serves as Trimble's key evidence of damages.[160]  Mr. Reynoso's critical conclusion was that "[Trimble's] perception is [Simplus] ha[s] delivered ~$1.4M worth of work that has been deemed acceptable, yet we have paid them close to $5M to date."[161]  So, Trimble suggests that the Court should subtract $1.4 million from the $4,972,662 that Trimble had paid Simplus and award Trimble the resulting $3,572,662.[162]  That won't do it.

Considering how important that "~1.4M" figure is to Trimble's case, the explanation of how Mr. Reynoso got there is awfully thin.  The only explanation came during Mr. Reynoso's testimony.  Here's the entirety of the relevant testimony:

> Q.  And then you say, "Our perception is that they have delivered approximately 1.4 million worth of work that has been deemed acceptable, yet we have paid them close to 5 million to date."  Do you see that?
>
> A.  Correct.
>
> Q.  I want to ask about the first part of that sentence.  Walk me through the process, Mr. Reynoso, by which you came to the conclusion that Simplus had provided approximately 1.4 million worth of work that has been deemed acceptable.
>
> A.  Yeah.  That was based off the analysis in column D [of Mr. Dhond's report], the percentage completions.  When you add the

---

[159]  *Id.* at 142, 153-54.

[160]  JX 190.

[161]  *Id.*

[162]  Trimble's Open. Br. at 33.

first assignment to the last assignment in a completion perspective from a proration calculation, it comes out to 1.4 million, around 1.4 million.

Q. So you took the completion percentage estimates that Mr. Dhond had done?

A. Yes.

Q. You crunched those numbers, so to speak?

A. Correct.

Q. Right?

A. Yes.

Q. And then your conclusion was based on those metrics that there was 1.4 worth - - million worth of value approximately - -

A. Correct.

Q. - - in the project?

A. Correct. Which is unfortunately about, you know, between 25 and 28 percent of the billed and pay value.[163]

That testimony doesn't shed much light on Mr. Reynoso's process. The Court is uncertain as to what Mr. Reynoso meant by "[w]hen you add the first assignment to the last assignment in a completion perspective from a proration calculation," which appears to have been Mr. Reynoso's core calculation. Too, the fact that Mr. Reynoso "crunched those numbers" does little to support the validity of

---

[163] Day 3 Tr. at 156-57.

- 39 -

Mr. Reynoso's number crunching. The Court is also left to wonder what Mr. Reynoso meant by "deemed acceptable." Did Mr. Reynoso assign zero value to work that was partially, but not fully, complete? If so, that doesn't properly account for the value of imperfect but usable work.

In the end, the Court does not need the answers to those questions to know Mr. Reynoso's estimate is off base for these purposes. That is because Mr. Reynoso's conclusion doesn't square with the other evidence. Trimble was "very satisfied" with Simplus's performance under the Salesforce Planning SOW, and Trimble does not allege any breach occurred in that initial stage.[164] And yet, Trimble paid Simplus $1,510,312.09 under that SOW alone.[165] By Trimble's numbers, then, all of Simplus's work under the other three SOWs was somehow worth *negative* $110,312. Put plainly, Trimble requests a windfall, not a remedy.[166]

Mr. Reynoso's email, therefore, is not a reasonable estimate of Trimble's damages. Trimble has presented no other evidence from which the Court can attempt to meaningfully gauge loss-in-value damages. Since the Court must base its

---

[164] *Id.* at 17-18.

[165] PTO ¶ 42. For the avoidance of doubt, the $1.5 million Trimble paid under the Salesforce Planning SOW is included in the "close to $5M" Trimble had paid when Mr. Reynoso did his analysis. *Compare id. with* JX 244 at T78934-39.

[166] *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *27 n.232 (Del. Ch. Aug. 2, 2023) ("[B]reach of contract damages should not provide a 'windfall' to the plaintiff." (quoting *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009))).

estimate on something more than conjecture,[167] the Court can't award loss-in-value damages here.

### b. *Remediation Costs*

Trimble's next option is to show what it would cost to bring Simplus's defective work into conformity.[168]  In this regard, Trimble points at the $4 million it paid to PwC.[169]  That doesn't work either, though.

While the relevant SOW between Trimble and PwC was labelled "DXR1.0 Remediation," it called for more than just fixing Simplus's mistakes.[170]  Rather, that SOW called for PwC to complete the Project and provide four weeks of support after the go-live.[171]  Accordingly, the $4 million figure represents the cost of completion, not the cost of remediation.  And none of Trimble's evidence indicates how much of PwC's renumeration pertained to fixing Simplus's work as opposed to going beyond what Simplus had been paid to do.  As a result, the Court has no factual basis on which to ground an estimate of the costs of remediation, so the Court can't award these damages either.

---

[167]  *See OptimisCorp.*, 2016 WL 2585871, at *3 n.11.

[168]  *See* Restatement § 348 cmt. c.

[169]  Trimble's Open. Br. at 33.  It isn't clear whether Trimble raised the $4 million as cost of remediation or cost of completion, which are related but distinct measurements.  To remove any doubt, the Court considers both.

[170]  JX 235 at T1841.

[171]  *See id.* at T1855-56; JX 241 at T78933; Day 3 Tr. at 214-15.

### c. *Increased Cost of Completion*

The $4 million Trimble paid to PwC provides a basis to determine cost-of-completion damages. But under the time-and-materials SOWs, Trimble never paid Simplus the full cost of completing the Project. In other words, by switching to PwC, Trimble avoided the cost of having Simplus finish the Project. That implicates Restatement Section 347(c).

Section 347(c) instructs that as part of the measure of damages, a plaintiff's award is reduced by "any cost or other loss that [the party] has avoided by not having to perform."[172] Delaware courts follow this approach.[173] So, to award Trimble the cost of having PwC complete the Project, the Court must subtract the cost Trimble avoided by not paying for Simplus to do that work.

The estimated cost for Simplus to finish the Project is reflected by proposed change orders that Simplus submitted in late July 2021.[174] Those change orders indicate how much more Trimble would have needed to pay Simplus to work through August, September, and October and to provide support following the go-

---

[172] Restatement § 347(c), cmt. d.

[173] *See, e.g.*, *WaveDivision Hldgs., LLC v. Millenium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *20 (Del. Ch. Sept. 17, 2020) ("[Plaintiff] should be entitled to recover the value it expected to realize from the Agreements *minus any cost avoided by not having to perform* . . . ." (emphasis added)).

[174] JX 180; JX 181.

live.[175]  For the month of August, Simplus requested an estimated $1,025,706.[176]  For September and October, Simplus requested an estimated $1,897,725.[177]  For the post-go-live support, Simplus requested an estimated $439,725.[178]  In all, Simplus estimated that it could complete the Project for an additional $3,363,156.

So, at last, the Court has a method by which to estimate a measure of Trimble's damages:  the cost of PwC completing the Project ($4,000,000), less the cost Trimble avoided by not paying Simplus to complete the project ($3,363,156), which results in $636,844 of damages.  Those damages will be set off against the amount Trimble owes Simplus for the unpaid invoices.

All that said, the Court is well aware that Trimble's true damages are likely greater than $636,844.  Indeed, this award does not account for the portion of the "cost of completion" that encompassed fixing work Simplus was already paid to do.  But the Court does not control the evidence that's presented to it.  Nor is the Court licensed to baselessly conjure an award that might, or might not, be a fairer estimate of Trimble's damages.  Trimble bore the burden to prove its damages.  It chose to devote little attention to the issue and propose awards that would bestow bountiful windfalls if granted.  That choice dictated what the Court could award.

---

[175]  *Id.*

[176]  JX 180 at S35139-46.

[177]  JX 181 at T37474.

[178]  *Id.* at T37475.

## VII.  CONCLUSION AND VERDICT

Consistent with the above, judgment is entered in favor of Simplus on its claim to earned fees under the MCSA, and in favor of Trimble on its counterclaim for breach of the MCSA and SOWs.  Simplus is entitled to $2,123,660.98 for its unpaid invoices; but that award is reduced by $636,844 to account for the cost Trimble incurred by having PwC, as opposed to Simplus, complete the Project.  Accordingly, Simplus is entitled to a final award of $1,486,816.98 plus interest.

The parties are instructed to prepare a form of final order of judgment consistent with this decision.  That proposed form of order is to be submitted on or before May 15, 2024.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____
Paul R. Wallace, Judge

Original to Prothonotary
cc: All Counsel via File and Serve